Good morning, your honors. Philip Bronson appearing for Mr. James. The first argument in the opening brief is where we've argued that the trial court erroneously excluded co-defendants Wilson's statements providing appellant with an alibi defense, specifically his statements that he did not see James from the time he was in the trial. The time that he went into Hinder's room on July 2nd until after the robbery on July 3rd following his return to the apartment. Was that hearsay? That would be hearsay, but our argument is that it was admissible under Federal Rule of Evidence 804 subdivision B. That it met the requirements of this statute because co-defendant inculpate the claimant. How did it inculpate? I mean, he said, I didn't see James there, but he's not saying, but I committed the bank robbery. Well, in the statement he mentions the words robbery. He says. How does it inculpate himself? How does it inculpate the declarant? Well, I think there's an implied admission when he's speaking about the robbery that there's an implied admission here that he participated in the robbery by saying that he did not see him until after the robbery on July 3rd following his return to the apartment. Especially considering it with the rest of the statement of this proffer that he made to the assistant United States attorney in which he confessed to the to the robbery. That's how we submit that this would be inculpated in which he inculpated himself in the offense. What is the citation of the excerpts of record as to the exact statement of this out-of-court declarant? 204 Exhibit 3. In my excerpt, it's at page in Appellant's excerpt is at page 29. That's that's not the excerpt number. This is Exhibit 3204. Is that what you're looking at? Yes. Federal Bureau of Investigation transcript 110602. Yes. And he says here, neither James nor Grettenberg were in Hinder's room that night. Wilson did not see James. Wilson did not see James from the time that he went into Hinder's room on the night of July 2nd, 2002, until after the robbery occurred on July 3rd, 2002. I think from this statement, the jury could could reasonably infer that Wilson is admitting to participating in the robbery. That's essentially our argument. And then. But where does it say in the statement that he's admitting participating in the robbery? He could easily have been stating I didn't see this fellow in the room from during the period of time when I've been told the robbery occurred or when the robbery occurred. It doesn't say. And I was a robber. There's an end. There's a slight inference that you think that's enough. I think that I think it's a reasonable inference, whether slight or substantial. And that should have been allowed to go to the jury. And I think that defense counsel should have, if it had gone to the jury, had been admitted to the evidence. I think that did this declare and plead guilty. Wilson Wilson Wilson pled guilty, as I recall, the record. OK. And then the argument is that. Assuming that this meets the requirement of any reasonable inference, that that Wilson was admitting he committed a robbery that met the three requirements of Section 804, three, four and B, four and three, because Wilson was unavailable because he had exercised his privilege against self-incrimination. And as I've just argued previously, the statement tended to subject Wilson to criminal liability. And the government has argued that the statement, because it was a proffer, the statement could be could not be used in their case in chief. Our argument is that the statement, there was no reason why the statement could not have been used in state court on a prosecution for just a common law robbery under Penal Code Section 211. And certainly if this statement were admitted in a trial in which the defense, in which the codefendant Wilson decided to testify that he could be impeached with. That his credibility would be undercut impeached with the introduction of the statement. And then there's the issue of trustworthiness of the statements. The statement was corroborated by the fact that there was no physical evidence found that linked. James to the parking lot or to the bank. And that was sufficient corroboration to make the statement trustworthy. Also, it was substantially as to this part of it. It was substantially in accord with codefendant Washington's proffer. But it's sort of conflicted with what Mr. Henders said. Henders testified that James had told him to go case the bank. And Grettenberg, didn't she also testify? Yes, she also testified. And that he'd come back with these guys from the robbery, I guess. That's true. But on the other hand, there is some corroborate. There is some corroboration of the statement that was sufficient to meet the defense burden of showing trustworthiness of the statement. And then there was a lack of evidence to contrive. Well, apparently there was evidence controverting the statement from Henders and also from Grettenberg. Is that her name? Yes. From Grettenberg. But we have the statement. Excuse me. We have the D. The there was a D. The stocking masks were tested for DNA and he didn't wear a stocking mask. He was in the car. That's true, Your Honor. But that would that would be one. You could still even even with that item or without that item. There is some corroboration because of the lack of physical evidence linking James to the parking lot or to the bank. And I'm not talking about Grettenberg's testimony or hinders, but of the fact of physical evidence itself that was lacking. But isn't the element of trustworthiness in 804 B3 the trustworthiness of the declarant, not the trustworthiness circumstantially established by other evidence or lack thereof? What evidence is there that Mr. Wilson was particularly trustworthy? Well, other than the fact that a reasonable person would would not admit to committing a federal bank robbery. That's one aspect that would show that would corroborate trustworthiness. But it's difficult on this record to go into Wilson's character and say that there was substantial evidence that he was a credible person. And the argument, our argument is based on the fact that there was corroboration because there was no physical evidence linking James to the parking lot. How do you handle LeGrand versus Stewart? It seems to suggest you have to parse out inculpatory from non-inculpatory statements. And only those statements that are inculpatory come in under this exception. Yes. But then in Pacneo, this circuit did parse out a statement. Well, but the statement in question there was both inculpatory and exculpatory. The statement itself. Like I did it, but my my kid wasn't with it. But yes. And I think it's similar. This is the same situation here. Wilson is admitting to his participation in the robbery while at the same time escalating James. But but if Wilson has said I did it alone, that would be an inculpatory statement that would exculpate at the same time. But somebody said, but he but it seems to me that he's also here. Wilson is propagating James by by while admitting he was in the robbery, that he wasn't present with him at the time of the robbery. How does the lack of James being in the robbery inculpate or exculpate Wilson any more or less? It doesn't. It's his own. It's it's. If you parse the statement, Wilson's statement that he did not see him until after the robbery, from which there's an inference there that that inculpates. The Wilson. Wilson is admitting his participation in the robbery and that while excluding James from being there. The question is, how does the exclusion of James inculpate Wilson? It. It doesn't really, does it? No. But in Pazio, he. He said that as to his son, that he, the father, was 100 percent responsible and therefore he was. Wilson doesn't say he's 100 percent responsible. As a matter of fact, we know that hinders when Washington were involved. It didn't seem to me that some of your other points, such as the sufficiency of the evidence of the use of a firearm during the robbery. Under the Pinkerton rule. Do you want to address that in that situation? The nuts. There does not appear to be any substantial evidence that appellant was aware that the James was aware that these individuals were going to use guns in the robbery. They have to be aware that they were using them or does he have to reasonably foresee under Pinkerton that they will be used given the plan of takeover, which was an operation? Well, I think the government was required to put on some evidence that there was some conversation about the use of weapons or that weapons. He was there when the weapons had been assigned to various persons or that he had seen them carrying weapons out of the apartment or that morning. There would need to be something more in this situation than just the fact that there were guns that had been used. If if he was supposed to be in the car and was supposed to be the service, a lookout that doesn't flow from that, that he would have to know or that it was reasonably foreseeable that he would know that guns would be used. It seems to me that there is no real evidence here to upon which to establish foreseeability and upon which the jury could have found foreseeability. And that's essentially our argument. And then there's the argument about the restraint in which we've argued that there needs to be something more than the use of a gun and the direction and a direction for the bank employee to follow. It seems that almost you think that when a gun is pointed at a bank manager and she's told, do this, do that, walk over there. Don't leave. That's not physical restraint. Not within the meaning of the of the enhancement. She was not tied down or locked up in a Thompson case. And one of our cases, 1997, a gun point equals physical restraint. But I think. Yes, it was. But I think Thompson is out of line with the other circuits in which they've had some finding of of actual physical restraint, such as being tied up. But can we overrule one of our panel decisions because it's out of line with other circuits? Don't we have to go and bank to do that? You and I don't have the answer to that specific question. I would I have about three minutes left. I'd like to reserve. That's fine. Thank you, Your Honor. May it please the Court. Good morning, Your Honors. Bill Crawford for the United States. In the in the time allowed, I'll address the three conviction trial issues principally and then perhaps briefly the two sentencing issues focusing actually on the latter of the two, because the first of the two, the restraint issue is within the law of this circuit that hasn't been overturned. Your Honor, straight to the discussion which occupied a considerable portion of the earlier argument, which is the issue of the unavailable witness, Mr. Wilson's statements and whether they were properly excluded. The Paglio case versus LeGrand and sort of analyzing the difference between the two and why this one fell within LeGrand, the government agrees with the implication of some of the questions asked by by the court. And with respect to Paglio, I would say the what distinguishes that or the that line of thinking suggests that the exculpatory part of the statement somehow needs to make the inculpatory part of the statement stronger or in some manner underscore the the the culpable role of the person making the statement. And in this case, that is not so. The the statement made that the court has before was made in the course of a longer discussion and it is separable. The statement that defense sought to get in at trial does not actually increase or enhance Mr. Wilson's role in that. If the court were to find that it was nonetheless not separable, the question then becomes was was it trustworthy? And in fact, the statement is is absolutely not trustworthy and not corroborated by anything trustworthy. The only corroboration of the exculpatory statement that Wilson makes comes from Mr. Washington's proffer done roughly contemporaneously. And in when reads both of those proffers together, they are significantly at odds with each other on key facts about that event, which clearly points to the fact that one or both of them is lying. And the trial court ruled that there was a failure to show trustworthiness of the statement. Yes, Your Honor. The trial court did rule that the trial court's government sector.  Yes, Your Honor. The the trial court's tentative order on this matter, which she then indicated that she would be signing and she the trial court, the trial court Senate order begins at government excerpt of record page two. And the actual statement where the court indicates that the court discusses LeGrand. And the court then does go on to to discuss trustworthiness. That would start on page. The court discussed Paglio. The court the court does not discuss Paglio, Your Honor. Paglio brought to the court's attention. Paglio was not it was not a part of either the defense brief or our brief at that time. The government focused on LeGrand and I don't remember the basis for defense, but I don't believe they raised Paglio. Paglio came up on appeal. How do you miss Paglio? I can't answer that question, Your Honor. It LeGrand is is the later case. It comes after Paglio in the order of decision making. And it seemed to be the case most directly on point. So what did the court say on the trustworthiness problem? What the court said on trustworthiness was the following. The court makes a general statement that would not be trustworthy. Are you paraphrasing? I excuse me, Your Honor. Are you paraphrasing? I am. Read. Read. Trust but verify. Read.  Well, when I was actually the court first lays out the OSPINA requirements. Read. The circumstances also fail to clearly corroborate the co-defendant's trustworthiness or the truth of their statements. James stresses the fact that his DNA was not found in the stocking masks used during the bank robbery, but this fact alone fails to clearly corroborate the co-defendant's statements because the circumstances indicate that a third person waited outside the bank while the masked robbers went in. Furthermore, Washington and Wilson are not clearly trustworthy since they know James and may have had reason to lie for him. There's a citation. The indicia of reliability are, therefore, far too insufficient to warrant admission of the co-defendant's proffer statements under Rule 804B3. Thank you. Thank you, Your Honor. Well, there was also on page 5, it started out, in this case, the statements were not spontaneous, bottom of page 5 after the cite to OSPINA. In this case, the statements were not spontaneous and were made only after arrest. This is one of the reasons why it wasn't trustworthy. Yes, Your Honor. In addition, Wilson and Washington made the proffer to the prosecutor defendants likely knew was in whom who the defendants likely knew was in a position to influence the charges against James. So that was also an addition. Yes, Your Honor. These various things indicated that the statements were not spontaneous. The Court did point to the immunized nature of the statement and what was going on at that point. As it emerged later at trial, when the Court actually also had the opportunity to hear the witnesses, the Court heard Mr. Hinder's description of what actually happened on the day of the robbery. The Court heard Nicole Grettenberg's statements as to what happened from her perspective, the defendant returning and all the circumstances related to that. The Court also heard the DNA expert. The absence of the scientific evidence doesn't corroborate Mr. Wilson's statement. The DNA expert indicated essentially that the lack of DNA of Mr. Wilson, of the defendant on either of the two robbers' masks was actually not probative of anything because the two known robbers did not have each other's evidence on their own masks either. Counsel, where is the evidence that James was aware or reasonably should have foreseen the use of a gun in this case? Yes, Your Honor. On that matter, it is the government's case. The government's argument, of course, is that. No, not the government's argument. I understand. Where is the evidence from which you argue? The government proved this case based on the foreseeability. And the evidence is as follows, Your Honor. During the course of the trial, the jury heard Henders talk about Mr. James' involvement in the, not only involvement but central role in planning this robbery. In the course of that, the jury heard Mr. Henders specifically talk about the questions that James asked him to look out for in the bank, the presence of security, the presence or absence of a glass security wall for the tellers, the number of tellers, people in the bank, and so forth. Henders came back and spoke to him on those issues and, among other things, said to him that there may be security in the bank. So on the issue of planning, we have the defendant very clearly focused on the details of how this robbery was going to take place. The night before he had arrived with his two co-conspirators, that night before he had already said to Mr. Henders, tomorrow morning I want you to take me somewhere, which he then did do that following morning. In addition to the information related to the bank specifically, and it was, according to Mr. Henders' testimony, Defendant James who told him where to go, the bank was already what appeared to have been pre-identified. Then on the very day of the robbery, when the three robbers go to the bank, all three of them go, Mr. James is obviously aware of that since he's one of the three. The witness outside the bank saw what he referred to as a silk stocking mask on top of their heads. He didn't see it pulled down, but he saw them on top of their heads. The defendant would have to have been aware of that. Obviously the defendant would have been aware of them running into the bank. In addition to that, the defendant was aware of the fact that his own car, not the car used to go to the bank, but his own car, we'll refer to it as the switch car, was parked somewhere with a gun underneath the front seat, which he had told Witness Grettenberg about the night before, I have a gun with me because he knew that she was uncomfortable with it. That's the first time I've heard the word gun used in your exposition of the evidence. Why isn't that consistent with him saying he's going to need a gun as part of his flight, but not as part of the commission of the crime? Your Honor, the fact that the gun is under the seat in the car that's going to be used in the getaway certainly doesn't indicate that he's going to be using it in the bank or anybody else will be using it in the bank. All right. Let's take a look at the other thing. The fact that he planned the robbery and asked about security in a glass wall is also consistent with the inference that he was deciding whether to rob that bank or not. If there were no security and no glass wall, it looks better for us. If there's security in a glass wall, it doesn't look so good for us. But where do you get the foreseeability of the use of a gun from the presence of security in a glass wall? The information that he had when Henders came back was that there might be security and there was no glass wall. That is consistent with somebody, that would assist somebody in planning on this kind of robbery and determining whether. You mean a takeover robbery? Yes, a takeover robbery because it would tell the listener of that there might be security. There are a number of people in the bank. So there is an issue here of control over this bank. At the same time, there is no glass wall which would render a gun possibly useless. What did Agent Brown say about a gun? Agent Brown spoke generally about background information on takeover robberies and the way they work. Ego Pine is an expert that guns are involved. Ego Pine is an expert that guns are involved in the overwhelming number of cases because the nature of that type of robbery would require the robbers to control everybody in the bank. Unlike a little note. I have a bomb in my shoe and here's a note, give me money. A note job would, I think the jury would be permitted to infer that a note job would be a considerably less conspicuous event than what Defendant James here. There is your evidence. Mr. Brown, as an expert, said that it's foreseeable in takeover robberies that guns be used rather than baseball bats or knives. Your Honor, Agent Brown's testimony is part of the evidence because the. We're looking at this de novo to see under a Rule 29 optic whether there's sufficient evidence to have submitted this issue and instruction to the jury. So all you've got to do is point to some substantial evidence. Yes, Your Honor. And use of that foreseeable use of a gun. And what you point to is Agent Brown's testimony and James's instruction to hinders to check the place out for security and glass. That is correct, Your Honor. But the. Was there any evidence that the three of them sat down and talked about what we're going to rob this bank and we're going to take it over? No, Your Honor, there is no evidence of that. The evidence is principally, as I've described it, and very importantly, the fact that Defendant James clearly appeared to be in charge of the planning and execution of this bank robbery. What evidence was there that James had a gun? The evidence that James had a gun was twofold. One, he said to Witness Grettenberg, I have a gun, because she was uncomfortable about that. Later on, after the robbery occurred, she took the police officers and identified James's car. And when they searched that car, there was, in fact, a gun underneath the driver's seat of that car. Your Honor, the ‑‑ on the issue of the excluded videotape, it hasn't come up, and perhaps there are no questions on that. The government believes, in a very summary form, that the defendant absolutely was not deprived of any opportunity to cross-examine the witness here. Well, Grettenberg was testified, and she related the warning, and she was cross-examined on that. Yes. With that, Your Honor, the government will submit. If there are no further questions. By the way, it hasn't been brought up by counsel, and I will ask him on this, but what's your position as to whether the appellant has asked for an amyline review of the sentencing? The government does not believe the appellant has asked for an amyline review of the sentencing. Thank you. And you mentioned it in the footnote of your opinion, the Booker case of indecided anamly. Yes, we did. There's no response to that from the other side. No, the reply does not respond to that issue directly. Mr. Bronson, you might ‑‑ you have a couple of minutes. You might address yourself, are you asking for an amyline review or not? And if so, where is it in your opening and reply brief? It's not, but I would request, if I could have 10 days to consider this. On what ground would you ask for an amyline review of resentencing? Because I did a briefly issue, and I haven't considered it. I would need to review the sentencing transcript again, and if there's an issue ‑‑ Well, you don't have any ground.  Yes, Your Honor. Well, the reason we ask that is because there can be circumstances where an amyline remand might be prejudicial to the defendant. And so we don't either encourage or discourage that. But in any case, you haven't asked for it. All right. Do you want to address any other issues? Just on the issue of the gun, their strongest evidence is what the agent testified to in concluding that this was a takeover robbery. But our position that it was still ‑‑ the evidence that was presented was still too speculative to allow the jury to conclude beyond a reasonable doubt. Is there any significance to the fact that he had a gun, to Grettenberg's testimony, to finding one in his car? It's difficult to work backward from that, because the gun was obviously there to assist in any escape. And is it rational to believe that you'd be planning to use a gun in an escape but not in the robbery itself? There would be some rational reason for believing that a person who was going to have a gun to use in an escape might be willing to use the weapon. It's a reasonable conclusion, Your Honor. And why would somebody make a conscious decision planning a takeover robbery of a bank with possible security not to use a gun inside the bank but to use one once outside? I could see how a person might rationally think that it's too dangerous to be using a gun inside the bank. Not too dangerous to be using a gun outside the bank? The chance on an escape that the gun would unlikely be used? I would submit, Your Honor. Mr. Bronson, in view of your request that you have 10 days to consider whether you wish to request an ammo line remand in any arrest of the defendant and consult it with Judge Thompson, I don't think Judge Thompson would have any objection. We'll give you 10 days to write a letter to the court determining whether you wish to have an ammo line remand and you decide any authority that you might find as to why you can ask for it at that late date. All right? Yes, Your Honor. Case is dismissed.
judges: Thompson, Trott, Bea